UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GINGER VLAHOS-SCHMIDT,

              Petitioner,

    v.

LARKIN,

              Respondent.

Case No.  14-cv-05184-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Ginger Vlahos-Schmidt filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254.  The Court issued an order to show cause why the writ should not be granted.  Respondent has filed an answer and Ms. Vlahos-Schmidt has filed a traverse.  For the reasons explained below, the petition will be **DENIED**.

## II.    BACKGROUND

A.    The Crime

On June 28, 2011, Ms. Vlahos-Schmidt stabbed her housemate, Zenon Lopata.  At trial, Ms. Vlahos-Schmidt admitted stabbing Mr. Lopata, and the critical question was whether the stabbing was done in self-defense based on his behavior that day and on previous occasions.  The California Court of Appeal described the evidence at trial about the household history and the criminal episode that led to Ms. Vlahos-Schmidt's conviction for assault with a deadly weapon:

> *The Prosecution's Case*
>
> [Zenon] Lopata, defendant, and Alicia Brown shared a three-bedroom flat on the top floor of an old Victorian on the corner of East 15th Street and 24th Avenue in Oakland. Each roommate had his or her own bedroom and shared a common kitchen, living room, and hallway.

United States District Court
For the Northern District of California

On February 20, 2011, Brown invited a group of musician friends to spend the night in the common area of the apartment. Lopata was unhappy about that and phoned the landlord from his room to complain. Defendant overheard the conversation and when he opened the door to his room, she stabbed him in the bicep with a pocket knife. He admitted pushing defendant, but denied slapping her in the face. The guests came to her defense, "beat[ing him] up and jump [ing] in [his] face." Lopata called 911 three times and said his life had been threatened, but "nobody came." Police dispatch evidence corroborated Lopata's calls.

There was also a dispute that day over vodka. Defendant had been drinking Lopata's vodka the day before and had promised to replace it the next day. Lopata asked defendant if she had replaced the vodka, and since she had not, Brown went out to get more.

For many weeks after that incident, there was no conversation or socializing between the three roommates, but by June 28, defendant and Lopata had begun talking again. Defendant had downloaded the television series "Weeds" on her laptop, and she offered to watch it with him. They plugged the computer into the television in his bedroom and watched the show for an hour and a half or two hours. He was in his chair eating and having "a few shots" while defendant sat on his bed drinking beer and vodka.

For some reason Lopata could not remember, a dispute arose and defendant punched him in the face. Defendant is a small woman, and he is 5 feet, 10 inches tall and weighs 220 pounds. She did not hit him very hard, but it was hard enough that he wanted the evening to be over. He pushed her out of his room and placed the laptop on the counter in the kitchen. She was not injured and went to her room.

About 10 or 15 minutes later, while he was hanging clothes in his room, he heard running steps and felt a big jolt in his back on the left side. He forcefully pushed her away from him and she fell to the ground against the heater and Alicia Brown's door. It is possible she could have been injured, but he did not see it because he was bleeding profusely and was in great pain as he knocked on Brown's door. He denied punching defendant in the face.

Defendant got up and ran away, yelling at Lopata that she was going to "call her friends at Hells Angels to have them kill me." At that point, he saw the knife in her hand. Lopata could not find his cell phone and Brown refused to open her door, so Lopata called 911 from the manager's apartment downstairs. Evidence of the 911 call was presented. This time, the police came right away and he was transported to Highland Hospital by ambulance. Defendant was detained and disarmed of the knife outside the gate to the apartment building. Her nose was injured, and she was distraught. Photos taken of both defendant and Lopata at the scene were admitted into evidence.

Lopata acknowledged that defendant had accused him of throwing her down the stairs, tossing her out of a futon, and spanking her, but

2

Lopata maintained, "that never happened." He denied telling defendant "your time is coming to an end, darling. You're going to get what's coming to you." He denied calling somebody on February 20 and saying, "you've got to come over here; we've got to kill these bitches." He did admit throwing a slipper that defendant had left in his room down the hallway in her direction.

*The Defense Case*

Defendant testified in her own behalf. Significantly, she testified to prior assaults and threats committed by Lopata. According to defendant, when she moved into the apartment in October 2010, Brown and Lopata already lived there. At first, they all got along well; she and Lopata cooked and ate together. Things began to change after a month. Lopata would get pushy and mad if defendant declined to drink with him. Lopata pretty much drank all day. He made mean, derogatory comments to defendant, argued with everything she said and put her down.

Once, in November or December 2010, for no apparent reason, Lopata overturned a futon while defendant was reclining on it. Lopata then went into his room and stayed there for the rest of the night. The next day Lopata apologized and acknowledged that his actions were "uncalled for."

Another time, shortly before February 20, 2011, Lopata threw defendant onto the futon and spanked her when she refused to drink with him. Defendant talked to Brown, a few of her friends, and the landlord about this incident.

On February 20, 2011, defendant asked Brown to go to the store to get more vodka, because Lopata's vodka was running low and defendant was afraid he would get angry when he ran out of it. When Lopata ran out of vodka before Brown returned, he yelled at defendant, grabbed her arms, and brought her towards him really hard. Because she was afraid of defendant who was out of control, she had a pocket knife in her hands. When Lopata would not let go of her, she brought the knife down onto his arm. "[T]hen he let go" and pushed her away. Some musician friends of Brown were staying at the apartment at the time of this incident.

Defendant heard Lopata say several times that he was calling the police. She also overheard Lopata say to someone on the phone: "You need to get over here now. We need to kill a couple of these bitches over here. We have two bitches. We need to take care of them." She told Brown to call the police and then waited outside with her son for the police to arrive for about 40 minutes. When no one came, defendant left with her son. She did not make a police report. After this incident, she asked the landlords to let her out of her contract, but they refused to do so.

Defendant was not on speaking terms with Lopata for many months after the February 20 incident. At some point, Lopata started making small talk with her when her son was visiting, and she was courteous to Lopata to keep the peace in front of her son.

3

Lopata kept asking defendant if she would let him watch the last season of the television series "Weeds" before the new season began, and on June 28 she agreed. She set up the computer and sat down to watch it with him for a few minutes before leaving to do something else, but he closed the door to his room after she sat down. She felt very uncomfortable with the door closed, but she "just played it off," talking to him for a few minutes before making an excuse to exit. She left and entered the room several times to "see where he was in the series, being courteous."

Right before the incident, defendant left to smoke a cigarette outside on the balcony. It was raining, and she put on her jacket. In the jacket pocket was a knife she had put there earlier in the day when she went to a store in a dangerous part of the neighborhood to buy cigarettes. After smoking her cigarette for about five minutes, she went back inside to check on Lopata again. "As soon as I turned the corner to his room, he started punching me in the face[.]" Defendant was pinned against the door and could not move while he was hitting her. Defendant was scared, shocked, and in pain. She "didn't know if he was going to stop." She pulled the knife out of her jacket pocket, "swung with it" just once with her right hand and connected. She was not aiming at any part of his body and could not see what she was doing because she "was being pummeled in the face." When the knife connected with Lopata he stopped hitting defendant. Defendant testified on cross-examination that she stabbed Lopata in self-defense. She did not, however, call the police that night.

Defendant ran as fast as she could out the door, slipped on a towel Lopata kept outside his door, and hit the heater with her left shoulder and arm. She caught herself before she fell down and continued running out the front door with the knife and sheath in her hand. She got into her car and drove to a friend's house for help. The friend did not respond to her honking and yelling outside his house. She drove back to her apartment and parked the car in the secure parking area.

She was detained by police when she walked into the front yard of the apartment building. Defendant testified she had a broken nose, a lump on her forehead, a chipped and loose tooth, and a swollen face. Her eyes turned black the next day. She was taken by ambulance to the hospital. Defendant gave her statement to the police about what Lopata had done to her. However, at the hospital, "the woman" who arrested defendant said she did not write down defendant's statement; she just wrote that defendant wanted to wait until she spoke to an attorney.

Alicia Brown testified that on the night of June 28, she arrived home from work around 6:00 p.m. and heard defendant in Lopata's room. It sounded friendly. She went into her room and turned on her music. She did not see or hear the altercation.

Nor did Brown see the altercation between defendant and Lopata on February 20. However, she generally corroborated defendant's version of the events leading up to that altercation and its aftermath. In particular, she testified that while she and defendant were waiting for the police to arrive, Lopata told somebody on the phone, "You

need to get over here. We need to kill these bitches." Brown called 911 and left the apartment. The police responded two hours later. Brown also testified that while she never saw Lopata hit or hurt defendant, she was afraid of Lopata.

Defendant's former boyfriend testified as a character witness. In the eight or nine years he had known defendant, he had never known her to be physically assaultive or violent, even when she had too much to drink.

One of the visiting musicians testified about the confrontation between defendant and Lopata on February 20. Lopata became loud, rude and angry. Defendant was trying to calm him down and Lopata was yelling at her. Lopata pushed defendant forcefully into the wall. The visitor confronted Lopata about his behavior, but Lopata responded that he could do whatever he wanted to defendant because it was his house. The visitor did not see defendant stab Lopata in the arm.

*People v. Vlahos-Schmidt*, Cal. Ct. App. No. A133704, June 12, 2013 Opinion ("Cal. Ct. App. Opinion") at 2-6.

B.   Procedural History

Following a jury trial in Alameda County Superior Court, Ms. Vlahos-Schmidt was found guilty of assault with a deadly weapon, and was found to have inflicted great bodily injury.  On October 28, 2011, she was sentenced to a total of five years in state prison, composed of the low term of two years for the assault and a consecutive three-year term for the great bodily injury enhancement.

Ms. Vlahos-Schmidt appealed.  The California Court of Appeal affirmed the judgment of conviction.  The California Supreme Court denied her petition for review.  Ms. Vlahos-Schmidt also filed unsuccessful state habeas petitions before filing this action.

In her federal petition for writ of habeas corpus, Ms. Vlahos-Schmidt asserts the following claims:  (1) the exclusion of some of her proposed testimony about a prior threat and prior violence by the victim violated her right to testify; (2) she received ineffective assistance of counsel; (3) the prosecutor engaged in misconduct in his closing argument; (4) cumulative error; and (5) ineffective assistance of appellate counsel.

The Court issued an order to show cause why the writ should not be granted.  Respondent has filed an answer and Ms. Vlahos-Schmidt has filed a traverse.  The matter is now ready for a decision on the merits.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

# V. **DISCUSSION**

A.    Limitations On Testimony About Victim's Past Conduct

   1.    Background

At trial, a critical issue was whether Ms. Vlahos-Schmidt had acted in self-defense when she admittedly stabbed Mr. Lopata. The court allowed Ms. Vlahos-Schmidt to testify about several prior incidents of a threatening and violent nature, but refused to allow her to testify about two particular incidents. Ms. Vlahos-Schmidt contends in her federal habeas petition that the exclusion of this testimony violated her constitutional right to testify.

**United States District Court**
For the Northern District of California

1    Throughout trial, the parties focused on the history of altercations and arguments between

2 Ms. Vlahos-Schmidt and Mr. Lopata that preceded the June 28th stabbing.[1]  After the cross-

3 examination of Mr. Lopata, the prosecutor objected that defense counsel had been referring to

4 more incidents than those that had been discussed during *in limine* proceedings where it had been

5 determined which past incidents would be admitted in evidence.  RT 90.  The prosecutor wanted

6 advance notice of events not previously discussed so their admissibility could be litigated before

7 the evidence was presented to the jury, or he wanted the evidence excluded.  RT 90-91.  The trial

8 court eventually ruled that the defense would be limited to presenting evidence about "the shoe

9 issue, the spanking on the Futon, and the slapping in the face shortly before the February 20

10 incident."  RT 92-93.  The trial court apparently based its ruling on state law requirements for

11 reciprocal discovery and explained that the defense had not "made a motion to bring that

12 [evidence] in.  We just can't have random things coming in."  RT 93.

13    The trial court's evidentiary ruling put limits on Ms. Vlahos-Schmidt's testimony because

14 she was the only one, other than Mr. Lopata, who was present for two particular incidents.  RT 93.

15 Ms. Vlahos-Schmidt thus was not allowed to testify to an incident in November 2010 where Mr.

16 Lopata "pushed [Ms. Vlahos-Schmidt] down the steps while they were smoking."  RT 93.  And

17 Ms. Vlahos-Schmidt was not allowed to testify to an incident in March 2011 in which Mr. Lopata

18 told her, "'Your time is coming to an end, darling.  You are going to get what you deserve.'"  RT

19 184.  (During his testimony, Mr. Lopata had denied that either incident occurred.  RT 85, 88.)

20    On appeal, Ms. Vlahos-Schmidt contended that the trial court's ruling excluding this

21 evidence was an abuse of discretion and violated her federal constitutional right to testify.  The

22 California Court of Appeal agreed that there had been error, but found it harmless.  The trial court

23 had erred under state law because California law did not require the advance disclosure of a

24 defendant's own statements.  Cal. Ct. App. Opinion at 7.  And the trial court erred because the

25

26 ───────────────

27 [1] To clarify, there were two stabbings that are referred to in this order.  Ms. Vlahos-Schmidt stabbed Mr. Lopata in his left bicep with a little pocket knife on February 20, 2011.  *See* RT 53. That stabbing left a mark, but he did not go to the hospital.  *Id.*  Ms. Vlahos also stabbed Mr.

28 Lopata in the back on June 28, 2011.  The June 28th stabbing is the one for which she was criminally prosecuted.

1   introduction of this relevant evidence would not have caused an undue consumption of time.  *Id.* at

2   8.

3         Evidence of Lopata's prior threats and acts of violence towards
4         defendant were admissible and relevant to defendant's claim she
          acted in self-defense. "Of course, the right to present relevant
5         testimony is not without limitation. The right 'may, in appropriate
          cases, bow to accommodate other legitimate interests in the criminal
6         trial process.' [Citation & fn. omitted.] But restrictions of a
          defendant's right to testify may not be arbitrary or disproportionate
7         to the purposes they are designed to serve. In applying its
          evidentiary rules a State must evaluate whether the interests served
8         by a rule justify the limitation imposed on the defendant's
          constitutional right to testify." (*Rock v. Arkansas, supra,* 483 U.S.
9         [44, 55-56 (1987)].) In our view, the court's response to defendant's
          proposed testimony that Lopata pushed her down the stairs and later
10        threatened her life was disproportionate to the purposes served by
          Evidence Code section 352. In particular, the court abused its
11        discretion when it prevented defendant from testifying that Lopata
          threatened her life, particularly after it permitted Lopata to deny he
12        ever said, "[y]our time is coming to an end, darling. You are going
          to get what you deserve."

13        Defendant maintains the error was prejudicial under *Chapman v.*
          *California* (1967) 386 U.S. 18 (*Chapman*) and requires reversal, but
14        after careful review of the entire record, we do not agree [that the
          error was not harmless]. In fact, the court did allow the jury to
15        consider a great deal of evidence of Lopata's prior violent behavior
          toward defendant which, if believed, could have supported an
16        acquittal based on self-defense. Moreover, the court correctly
          instructed the jury on self-defense and antecedent threats, and
17        evidence of one such threat was admitted. In addition, defendant
          testified at length about the injuries she suffered at Lopata's hands
18        on June 28 and about the circumstances under which she stabbed
          Lopata in the back. Photos of both parties' injuries were admitted, as
19        well as evidence of Lopata's 911 calls to police, and defendant's
          failure to call the police. "Under *Chapman*, the question is whether
20        there is a reasonable doubt that the error contributed to the verdict."
          (*People v. James* (2000) 81 Cal.App.4th 1343, 1362.) Here, we are
21        convinced beyond a reasonable doubt the error did not contribute to
          the verdict because the excluded evidence was "unimportant in
22        relation to everything else the jury considered on the question of the
          defendant's guilt, as revealed in the record." (*Ibid.*, citing *Yates v.*
23        *Evatt* (1991) 500 U.S. 391, 403, italics added, disapproved on other
          grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, fn. 4.)

24

25  Cal. Ct. App. Opinion at 8-9.

26       As the last reasoned decision from a state court, the California Court of Appeal's decision

27  is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

28  1091-92.  Ms. Vlahos-Schmidt is entitled to habeas relief only if the California Court of Appeal's

United States District Court
For the Northern District of California

decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

    2.   <u>Analysis.</u>

    The right to testify on one's own behalf at a criminal trial has sources in several provisions of the United States Constitution.  It is one of the rights that "are essential to due process of law in a fair adversary process."  *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (holding that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify).  It is a fundamental Constitutional right.  *See id.* at 53 n.10.  The harmless error standard applies if the court finds that the right to testify has been denied.  *See Martinez v. Ylst*, 951 F.2d 1153, 1155 (9th Cir. 1991).  That is, habeas relief is not available unless the error resulted in actual prejudice -- that it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

    The California Court of Appeal impliedly held that the error by the trial court in limiting Ms. Vlahos-Schmidt's testimony was of constitutional magnitude when it applied *Chapman*'s prejudice analysis, because *Chapman* "fashion[ed] a harmless-constitutional-error rule."  *Chapman*, 386 U.S. at 23.  When, as here, the state court has found the error harmless, federal habeas relief is not available for the error "unless *the harmlessness determination itself* was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (emphasis in original).  In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* (quoting *Harrington v. Richter*, 562 U.S. at 103).  "A determination that the error resulted in 'actual prejudice' *Brecht*, 507 U.S. at 637, necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable, *Davis*, 135 S. Ct. at 2198-99."  *Mays v. Clark*, 807 F.3d 968, 979-80 (9th Cir. 2015).

    At the outset, it is helpful to understand the significance of the evidence of the victim's prior acts in relation to the crime and defense offered at trial.  That understanding is aided by a

review of the self-defense jury instruction given in Ms. Vlahos-Schmidt's case, which correctly stated California law on self-defense and antecedent threats. *See* Cal. Ct. App. Opinion at 8.

After instructing the jury on the crime of assault with a deadly weapon or force likely to produce great bodily injury and the related enhancement allegations, the trial court gave the following instruction on self-defense.

> The defendant is not guilty of those crimes if she used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if:
>
> 1. The defendant reasonably believed that she was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully;
>
> 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;
>
> AND
>
> 3. The defendant used no more force than was reasonably necessary to defend against that danger.
>
> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to herself. Defendant's belief must have been reasonable and she must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense.
>
> When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.
>
> *If you find that Zenon Lopata threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.*
>
> *If you find that the defendant knew that Zenon Lopata had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.*
>
> *Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.*

> The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty.

CT 116 (CALCRIM 3470, as modified) (emphasis added).[2]

The importance of the prior violence and threats by the victim was that, if the jury found that Mr. Lopata "threatened or harmed" Ms. Vlahos-Schmidt in the past, the jury could "consider that information in deciding whether [her] conduct and beliefs were reasonable" with regard to the danger he posed and the need to use force against him on June 28th. CT 116. "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person." *Id.*

In light of the self-defense instruction given at her trial, the incidents that Ms. Vlahos-Schmidt *was* able to testify about provided ample evidence (if believed) to allow the jury to apply these portions of the self-defense instruction. As the California Court of Appeal noted, even if she was not allowed to testify that Mr. Lopata pushed her on stairs and told her that her "time was coming to an end," Ms. Vlahos-Schmidt testified to other incidents that would give the jury a similar view of Mr. Lopata, if believed. First, Ms. Vlahos-Schmidt testified about an occasion in November or December 2010, when she was lying on a futon in the living room and using her laptop computer. She testified that Mr. Lopata – for no apparent reason -- "walked into the house

---

[2] The jury also was instructed on mutual combat and defendant-as-aggressor:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>
> 1. She actually and in good faith tried to stop fighting;
>
> AND
>
> 2. She indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that she wanted to stop fighting and that she had stopped fighting.
>
> If the defendant meets these requirements, she then had a right to self-defense if the opponent continued to fight.

CT 117 (CALCRIM 3471, as modified). And the jury was instructed that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." CT 118 (CALCRIM 3472, as modified).

**United States District Court**
For the Northern District of California

and started to walk towards his room and then suddenly stopped, turned, ran up to the Futon, grabbed the edge of it, and flipped the whole thing over," causing Ms. Vlahos-Schmidt to land on the floor with the futon on top of her.  RT 214, 215.  Second, Ms. Vlahos-Schmidt testified that, when she declined Mr. Lopata's request to drink a shot of vodka with him and turned to go to her room one day in February 2011, Mr. Lopata "grabbed [her], drug [her] into the living room, threw [her] face first on the Futon and spanked [her]" in a non-playful way.  RT 216.  Third, Ms. Vlahos-Schmidt testified about events on February 20th that led up to her stabbing Mr. Lopata in the arm that day.  According to Ms. Vlahos-Schmidt, Mr. Lopata became angry when the vodka ran out, and yelled at her that she (rather than housemate Ms. Brown, who was already on her way to buy more vodka) had to go to get him more vodka.  Ms. Vlahos-Schmidt testified that Mr. Lopata then "grabbed [her] arms, both arms.  He – like really, really hard, and he brought [her] towards him.  He backed into the wall and, like – like pulled [her] really hard towards him."  RT 221.  She became scared, and when Mr. Lopata "wouldn't let go of [her]" she "brought the knife down onto his arm, and then he let go of [her]."  RT 222.  Fourth, Ms. Vlahos-Schmidt testified that, later on February 20th, Mr. Lopata was on the telephone to an unidentified party saying, "'You need to get over here now.  We need to kill a couple of these bitches over here.  We have two bitches.  We need to take care of them.'"  RT 224.  This prompted her to take her son, exit the building and ask Ms. Brown to call the police.  *Id.*[3]

Further, Ms. Vlahos-Schmidt testified that she stabbed Mr. Lopata on June 28th because he abruptly and for no reason "started punching [her] in the face," and broke her nose.  RT 231, 234.  According to Ms. Vlahos-Schmidt, Mr. Lopata punched her several times; she testified that she "couldn't move with him hitting [her]," "didn't know what was going to happen," or "if he was going to stop."  RT 235.  She testified that she "was being pummeled in the face" when she pulled out her knife and stabbed him. RT 236.  Ms. Vlahos-Schmidt stated that she sustained a broken

---

[3] Housemate Ms. Brown also testified that she was afraid of Mr. Lopata, RT 158, and heard him talking on the phone on February 20th, saying, "'You need to get over here.  We need to kill these bitches.'"  RT 151.  The jury instruction on self-defense stated that, if Ms. Vlahos-Schmidt knew that Mr. Lopata "had threatened or harmed others in the past, you may consider that information in deciding whether [her] conduct and beliefs were reasonable."  CT 116.

nose, a lump on her forehead, a chipped tooth that was loose, two black eyes and a swollen face as a result of the beating she took from Mr. Lopata before she stabbed him.  RT 243.  If believed, this testimony about events before and on June 28th could have supported an acquittal based on self-defense, as the California Court of Appeal determined.  *See* Cal. Ct. App. Opinion at 8.

This case was a credibility contest, with the parties offering very different versions of Mr. Lopata's character and behavior.  The prosecutor argued, and Mr. Lopata testified, that Mr. Lopata *never* hit or threatened violence against Ms. Vlahos-Schmidt, although he did admit that he pushed her away after she stabbed him in the arm on February 20th and once threw a slipper in the hall after her.  On the other side, the defense argued, and Ms. Vlahos-Schmidt testified, that Mr. Lopata had harmed her and threatened her in the past and was hitting her when she stabbed him on June 28th.  The jury was able to view photos that were taken of Ms. Vlahos-Schmidt and Mr. Lopata on June 28th, as well as photos taken of Ms. Vlahos-Schmidt a few days later.  The record suggests that Ms. Vlahos-Schmidt's version of events on June 28th was not believed.  There is no reason to think that the jury struggled to determine that perhaps Ms. Vlahos-Schmidt could have used force, but just not as much force as she did use, to deal with Mr. Lopata on June 28th.  Defendant made no such argument to the jury.

The jury was presented with a choice of believing Ms. Vlahos-Schmidt or Mr. Lopata.

The jury deliberations were neither unusually short nor unusually long.  The jury deliberated for at most three hours (including breaks) after about 14 hours of trial time.  *See* CT 81-87, 123, and 125.  The jurors sent no questions to the court about self-defense.[4]  "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (2.5 hour jury deliberations in illegal reentry case suggested any error in allowing testimony or commentary on

---

[4] The only question the deliberating jury sent to the court was a request for the "definition of 'harm' as used in 'greater than minor or moderate harm.'"  CT 122.  That language is used in the instruction for the great bodily injury sentence enhancement allegation.  *See* CT 115 ("*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.")

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-day jury deliberations supported inference that impermissible evidence affected deliberations).  The 3-hour deliberations following a 14-hour trial, do not suggest a particularly difficult or particularly easy case.  The length of the jury deliberations weighs neither in favor of, nor against, a finding of harmlessness here.

Ms. Vlahos-Schmidt argues that the incidents she was not allowed to testify were different in kind from the other incidents because they showed a threat to kill her and violence that could have inflicted serious harm or death.  However, it was not necessary for past threats to be threats to kill, or for past violence be of the sort that would inflict serious harm or death, in order for them to be considered for self-defense purposes under the jury instruction quoted at pages 11-12, *supra*. Although the "your time is coming to an end" statement and the push down the stairs may have been different than the incidents about which Ms. Vlahos-Schmidt did testify, the disallowance of this testimony was harmless because her testimony about these two incidents would have been on similar footing in terms of credibility as her other testimony.  *Cf. Woods v. Sinclair*, 764 F.3d 1109, 1126 (9th Cir. 2014) (Confrontation Clause violation harmless because contested evidence was cumulative of other testimony in all material aspects).

The California Court of Appeal could have reasonably found the trial court's error harmless not only because the excluded testimony was somewhat cumulative, but also because the disallowance of that testimony would have been on similar footing in terms of credibility as her other testimony.  *Cf. Woods v. Sinclair*, 764 F.3d 1109, 1126 (9th Cir. 2014) (Confrontation Clause violation harmless because contested evidence was cumulative of other testimony in all material aspects).  Ms. Vlahos-Schmidt had an uphill battle in establishing self-defense, particularly given that she had stabbed Mr. Lopata once before and this time literally stabbed Mr. Lopata in the back.  Adding to the difficulty in her uphill battle was the photographic evidence that apparently did not support her description of being pummeled and punched repeatedly in the face by Mr. Lopata, who was 5'10" tall and weighed 220 pounds.  RT 73.  (The photographs are not in the record before this Court, and were not in the record on appeal.)  The testimony and the closing arguments suggest that the photos of Ms. Vlahos-Schmidt taken on the day of the stabbing did not

15

United States District Court
For the Northern District of California

show much damage to her face and she had no defensive wounds.  Officer Hunt testified that Ms. Vlahos-Schmidt's nose was injured and "bleeding a little bit" when he first encountered her.  RT 130, 131.  He also testified that her booking photo is what she looked like on the day of the stabbing.  RT 122.  Officer Clifford testified that a mark on her lip in a photo was a tattoo rather than blood.  RT 109-10.  In his closing argument, the prosecutor urged that "the photographs of the defendant do not corroborate whatsoever her version of the event," RT 284; the injury to her face was due to her falling as she fled, RT 285, 289, 326; Ms. Vlahos-Schmidt had no injuries to her hands; RT 285; and asked the jurors "to look at the photos because she does not have the injury of being beaten with a forceful fist by Zenon Zapata (sic)," RT 298.  The defense counsel's closing argument focused much more on Ms. Vlahos-Schmidt's testimony about her injuries than on the photographic evidence, *see* RT 305-06.  Photos also were shown of Mr. Lopata's hands and the stab wound he has sustained. An officer testified that Mr. Lopata had no injuries to his hands. RT 115.  The prosecutor relied on the absence of injuries to Mr. Lopata's hands to argue both that Mr. Lopata had not been punching anything and had been stabbed so unexpectedly that he did not have time to get his hands up to defend against a knife attack.  *See* RT 295, 323.

Respondent contends that the two incidents that Ms. Vlahos-Schmidt was precluded from testifying about "*were* introduced at trial, albeit not through petitioner's testimony.  Trial counsel accused Lopata of making the veiled threat and pushing petitioner down the stairs during her cross-examination and mentioned the threat during her opening statement."  Docket No. 14-1 at 17.  That argument is meritless.  Mr. Lopata denied both incidents.  Arguments of counsel and questions by counsel are not evidence, and the jury was so instructed.  *See* CT 94 (jury instruction that "[n]othing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.")

The California Court of Appeal's determination that the violation of Ms. Vlahos-Schmidt's right to testify was harmless was not unreasonable.  Under the circumstances, it cannot be said that the prohibiting Ms. Vlahos-Schmidt from testifying that Mr. Lopata once told her that her "time was coming to an end" and another time pushed her down stairs had a "'substantial and injurious

16

effect or influence in determining the jury's verdict,' *Brecht*, 507 U.S. at 637, much less that the state court's harmlessness determination was "unreasonable," *Davis*, 135 S. Ct. at 2199.  The California Court of Appeal's determination that the violation of Ms. Vlahos-Schmidt's right to testify was harmless error was not itself an unreasonable determination.  That is, the harmless error determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Davis*, 135 S. Ct. at 2199.  Habeas relief therefore is barred on this claim by 28 U.S.C. § 2254(d)(1).

B.     Ineffective Assistance Of Trial Counsel Claims

1.     Background

Ms. Vlahos-Schmidt contends that her trial counsel provided ineffective assistance in violation of her Sixth Amendment right to counsel.  Trial counsel's alleged errors consisted of: (a) failing to obtain and present documentation of death threats by Mr. Lopata; (b) failing to point out inconsistencies in Mr. Lopata's testimony that he did not re-enter the house after calling 9-1-1; (c) failing to "properly question" Peter Lindsay; (d) failing to present testimony of the landlords who had received complaints about Mr. Lopata and testimony of a police officer who Ms. Vlahos-Schmidt talked to on June 28th; (e) failing to obtain and present medical records for Ms. Vlahos-Schmidt from June 28th; and (f) erroneously convincing Ms. Vlahos-Schmidt to testify.  Docket No. 1 at 4-5.

Ms. Vlahos-Schmidt presented only claims (a) to (d) to the Alameda County Superior Court in a petition for writ of habeas corpus.  The superior court rejected the four claims as untimely filed[5] and on the merits.  Docket No. 1 at 56-57.  The court identified the *Strickland* standard and rejected all the ineffective assistance of counsel claims for "failure to sustain petitioner's burden of proof as to deficient performance and prejudice."  Docket No. 1 at 58.  Although all the claims were rejected, the superior court only discussed some of the claims.  With

---

[5] Respondent points to the superior court's rejection of the claim as untimely and argues that the claim is procedurally defaulted as well as meritless.  This Court need not reach the procedural default question because the claim fails on the merits. *Cf. Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.")

United States District Court
For the Northern District of California

respect to the claim that counsel had not presented documentary evidence of the 9-1-1 call, the superior court explained that "evidence of the 911 call was admitted at trial" through the testimony of Ms. Vlahos-Schmidt and Ms. Brown about the incident on February 20th.  Docket No. 1 at 57.

> As [to] the ineffective assistance of counsel factual claim relating to the failure to call certain witnesses and make certain arguments, Petitioner also failed to state a prima facie case for relief.  Petitioner simply asserts that her landlord should have been called as a witness because the landlord would have been a "neutral witness" and "would have been much more effective than the personal acquaintances of the Petitioner."  Petitioner also asserts that trial counsel should have called a "female police officer" whom Petitioner states she gave a statement to while at the hospital on June 28, 2011.  Petitioner states that the "female police officer" told Petitioner that she would not be including Petitioner's statement in the police report, but was "instead (falsely) writing that the petitioner wished to speak with an attorney before she made a statement."  Petitioner's self-serving and uncorroborated statements regarding the alleged failures of [her trial counsel] are insufficient to sustain Petitioner's burden of proof as to deficient performance and prejudice. See *In re Alvernaz* (1992) 2 Cal. 4th 924, 945.)  Moreover, counsel cannot be faulted for deciding not to call a witness whose testimony might do more harm than good.

Docket No. 1 at 57-58.  The California Court of Appeal and the California Supreme Court summarily denied Ms. Vlahos-Schmidt's later habeas petitions.

As the last reasoned decision from a state court, the Alameda County Superior Court's decision is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92.  Ms. Vlahos-Schmidt is entitled to habeas relief only if the Alameda County Superior Court's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.[6]

---

[6] The superior court discussed the reasons for rejecting claims (a) and (d), but not claims (b) and (c).  The superior court's decision is a reasoned decision because it explains at least some of its analysis.  Even if that decision was considered to be an unexplained decision as to claims (b) and (c) due to a failure to explicitly discuss those claims, the outcome would be the same here.  Section 2254(d) applies to both reasoned and unexplained decisions.  *See Harrington v. Richter*, 562 U.S. at 99.  If the superior court's decision is considered an unexplained decision as to claims (c) and (d), the federal court determines what arguments/theories that did or could have supported the state court's decision and then decides "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

United States District Court
For the Northern District of California

2.      Analysis

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, she must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id* at 687-88. Second, she must establish that she was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. at 105.

a.      "Documentation" of Prior Threats and Physical Acts

Ms. Vlahos-Schmidt urges that counsel failed to obtain and present a transcript of the 9-1-1 call made by Ms. Brown on February 20th. The superior court reasonably rejected this contention on both prongs of the *Strickland* analysis. Assuming arguendo that the transcript Ms. Vlahos-Schmidt attaches to her petition is accurate, the 9-1-1 call transcript contained the same information that was given in the testimony of Ms. Vlahos-Schmidt and Ms. Brown. The superior court reasonably determined that, because evidence of the 9-1-1 call was admitted at trial through the testimony of Ms. Brown and Ms. Vlahos-Schmidt, the transcript would have only showed that they made the same allegations before trial, and it was not documentary proof of the actual threat or the alleged violence. The transcript is not a transcript of Mr. Lopata's utterances. Additionally, because Ms. Brown and Ms. Vlahos-Schmidt left the area after Ms. Brown made the 9-1-1 call,

19

**United States District Court**
For the Northern District of California

they did not make a police report about the incident.  Due to the fact that the 9-1-1 call transcript included no additional details regarding the incident or any other threatening behavior by Mr. Lopata, trial counsel reasonably may have decided to rely on the testimonial evidence from Ms. Vlahos-Schmidt, as well as Mr. Oropeza (who saw the push that preceded the call), and Ms. Brown (who made the call).  *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (holding "it was not unreasonable for counsel not to pursue such testimony when it was largely cumulative of the testimony" already offered).

As to the prejudice prong, it was not an unreasonable application of *Strickland* to determine that there was no reasonable probability of a different outcome if the transcript had been presented.  The 9-1-1 call had been made on February 20th, about four months before the charged offense, and the events covered in the transcript of the call had been testified to by several witnesses.  Further, the 9-1-1 call did not contain any firsthand statement by Mr. Lopata.  The transcript did not document any threat by him, any more than the live witnesses did.  Also, as mentioned in Section A, above, there were several facts strongly undermining the believability of Ms. Vlahos-Schmidt's self-defense claim – Ms. Vlahos-Schmidt stabbed the victim in the back after stabbing him four months earlier, plus her facial wounds apparently did not match her testimonial description of being pummeled in the face by Mr. Lopata just before she stabbed him on June 28th – and these facts would not likely have been affected by the introduction of the 9-1-1 call transcript from February 20th.

The superior court reasonably determined that there was neither deficient performance nor resulting prejudice from the failure to present a 9-1-1 call transcript that would have provided the same information the live witnesses provided in their testimony.

            b.     Mr. Lopata's Post-stabbing Conduct

Ms. Vlahos-Schmidt urges that counsel should have "point[ed] out inconsist[e]ncies in Zenon Lopata's testimony that he did not reenter the house after he called 911."  Docket No. 1 at 5.  Mr. Lopata testified that he called 9-1-1 from inside the building and went out to wave to the police when he heard the police arriving.  RT 80.  Ms. Vlahos-Schmidt fails to explain why cross-examining Mr. Lopata on this point would have been of any value, especially since defense

counsel was able to establish that Mr. Lopata was in the house after calling 9-1-1 via the testimony of the first responding police officer, whose credibility was not in question. That officer testified that the victim was not outside when he arrived, so the officer called in to the police dispatcher and had the dispatcher call back the 9-1-1 caller and tell him to come outside, which resulted in Mr. Lopata coming outside to meet the officer. RT 121-22. Defense counsel extensively cross-examined Mr. Lopata on other matters. Ms. Vlahos-Schmidt fails to show any advantage to be gained by cross-examining Mr. Lopata on an inconsistency about his behavior after he had been stabbed and was bleeding before the police arrived. The superior court reasonably determined that the failure to cross-examine Mr. Lopata on this point which was established by another witness was neither deficient performance nor prejudicial to Ms. Vlahos-Schmidt.

c.      Questioning of Peter Lindsay

Ms. Vlahos-Schmidt contends that defense counsel failed to "properly question" Peter Lindsay, the father of her child, about a prior incident during which Mr. Lopata was drunk and agitated. Docket No. 1 at 5. In support of this claim, Ms. Vlahos-Schmidt attached a declaration from Mr. Lindsay, who declared that Ms. Vlahos-Schmidt brought their son to Mr. Lindsay's house in early 2011 after an incident involving Mr. Lopata. Docket No. 1 at 31. Mr. Lindsay declared that Ms. Vlahos-Schmidt "told me that Zeno was drunk and agitated and that she did not want [the child] to be around him." *Id.* Mr. Lindsay further declared that Ms. Vlahos-Schmidt told him during her trial "that she had asked her lawyer Linda to ask me about this early 2011 incident while I was on the stand, so the jury could hear of Zeno's prior episodes of drunk and aggressive behavior," but the attorney did not pursue this line of questioning. *Id.*

The exhibit shows the problem rather plainly: Mr. Lindsay had no firsthand knowledge and any testimony from him about Mr. Lopata's drinking and agitation likely would have been inadmissible hearsay if offered to prove that Mr. Lopata was drunk and agitated. Counsel did not engage in deficient performance in failing to try to elicit the testimony because it would have been ruled inadmissible under the hearsay rule. Defendant has not argued the testimony should have been admitted under an exception to the hearsay rule. *Cf. Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (failure to object to admission of evidence on one ground not ineffective

21

where the evidence would have been admitted in any event for a different purpose).  In her

traverse, Ms. Vlahos-Schmidt contends that the evidence showed that she feared for the safety of

her son.  Docket No18 at 1.  But that would have been irrelevant to her defense of self-defense

because her son was not present on June 28th.  And since it would have been ruled inadmissible as

hearsay or irrelevant evidence, no prejudice resulted from counsel's failure to offer the evidence.

The superior court reasonably rejected this claim for failure to show deficient performance and

prejudice.

### d.     Landlord and female police officer

Ms. Vlahos-Schmidt contends that counsel was ineffective in failing to contact and present

testimony from "professional witnesses" who had received her complaints of violence and death

threats made by Mr. Lopata.  Docket No. 1 at 5.  She presents a copy of an email exchange

between her and her landlord complaining about Mr. Lopata's behavior, although the full text of

the email cannot be read because the photocopied highlighting actually conceals the text under it.

*See id.* at 10.  She also states that she told a female officer on June 28th that he had attacked her

first.  *See id.* at 5.  The superior court rejected this claim because Ms. Vlahos-Schmidt's "self-

serving and uncorroborated statements" were insufficient to show deficient performance or

resulting prejudice.

As with Mr. Lindsay, the landlord and the female officer had no firsthand knowledge of

Mr. Lopata's behavior and could only relay what they had heard from Ms. Vlahos-Schmidt.  That

would have been hearsay insofar as it was intended to prove that Mr. Lopata threatened or harmed

Ms. Vlahos-Schmidt.

The evidence did have slight corroborative value in that the emails  showed that Ms.

Vlahos-Schmidt's complaints about Mr. Lopata were not post-stabbing fabrications, and her

comments to the female police officer (if believed) tended to show that the allegation that Mr.

Lopata had punched her when she stabbed him was not a made-for-trial invention.  But again. the

proposed testimony could not establish that Mr. Lopata had harmed or threatened Ms. Vlahos-

Schmidt.

Ms. Vlahos-Schmidt has failed to show that the failure to call these witnesses was deficient

22

**United States District Court**
For the Northern District of California

1    performance or that prejudice resulted from not calling them.  The superior court reasonably

2    rejected this ineffective assistance of counsel claim, finding that Ms. Vlahos' "self-serving and

3    uncorroborated statements" were insufficient to show deficient performance or resulting prejudice.

4         Applying the "'highly deferential' look at counsel's performance," through § 2254(d)'s

5    already "'deferential lens,'" *Cullen v. Pinholster*, 131 S. Ct. at 1403, it cannot be said that the

6    Alameda County Superior Court's rejection of Ms. Vlahos-Schmidt's foregoing ineffective

7    assistance of counsel claims was contrary to or an unreasonable application of *Strickland*.  The

8    Alameda County Superior Court's analysis presents a "reasonable argument that counsel satisfied

9    *Strickland's* deferential standard," and that is sufficient to bar relief under § 2254(d).  *See*

10   *Harrington v. Richter*, 562 U.S. at 105.  Ms. Vlahos-Schmidt is not entitled to the writ on these

11   claims.

12              e.    Medical records

13        Ms. Vlahos-Schmidt contends that trial counsel "failed to obtain and present medical

14   records proving that the petitioner was taken to the hospital by ambulance due to injuries inflicted

15   on her by Zenon Lopata on the night of the offense."  Docket No. 1 at 4-5.  Respondent argues that

16   this claim is unexhausted but nonetheless should be rejected on the merits.

17        Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

18   either the fact or length of their confinement are required first to exhaust state judicial remedies,

19   either on direct appeal or through collateral proceedings, by presenting the highest state court

20   available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

21   federal court.  *See* 28 U.S.C. § 2254(b), (c).  A district court may deny, but not grant, relief on a

22   habeas petition that presents an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1).  The district court

23   can deny an unexhausted claim only when "it is perfectly clear that the applicant does not raise

24   even a colorable federal claim."  *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

25        Ms. Vlahos-Schmidt's claim that counsel provided ineffective assistance in failing to

26   present medical records is unexhausted because she never fairly presented that claim to the

27   California Supreme Court.  She filed two petitions in the California Supreme Court: a petition for

28   review (Docket No. 14-7 at 84-95) and a petition for writ of habeas corpus (Docket No. 14-7 at

100-120).  Neither petition included a claim that counsel was ineffective in failing to present medical records.

This Court will deny relief on this unexhausted claim because the claim is plainly meritless.  Ms. Vlahos-Schmidt does not state that she received any medical treatment that would reflect her having been punched repeatedly in the face.  She contends only that counsel should have obtained documentary proof that she was transported in an ambulance.  But Ms. Brown's testimony established that Ms. Vlahos-Schmidt was in an ambulance after the stabbing.  RT 156.  And if there was no documentation of medical treatment to accompany the ambulance ride, it would have made it even less likely that the jury would believe her story that Mr. Lopata was pummeling her in the face before she stabbed him.  The booking photos apparently suggested minimal damage to Ms. Vlahos-Schmidt's face, so pointing out that she rode in an ambulance would have been of no help (or possibly even harmful to the defense) without records from the hospital showing, e.g., the broken nose she claimed to have sustained.  (The prosecution did not present Mr. Lopata's medical records -- his injuries required several visits to the hospital to deal with an open wound, and some concern about potential injury to a vital organ -- but might have presented such evidence if Ms. Vlahos-Schmidt presented her own medical records which are not alleged to have shown any treatment for a serious injury.)  Ms. Vlahos-Schmidt has not shown that counsel's failure to present evidence that she was transported in an ambulance was deficient performance or resulted in any prejudice to her.

          f.         <u>Convincing Ms. Vlahos-Schmidt to testify</u>

Ms. Vlahos-Schmidt argues that counsel was ineffective in "convincing" her to testify.  Docket No. 1 at 5.  Ms. Vlahos-Schmidt reasons that, due to the limits on her testimony discussed in Claim A -- i.e., she could not testify that Mr. Lopata had told her that her "time was coming to an end" and pushed her on the stairs on another occasion -- "she had to skirt around those crucial events, which caused her to have gaps and inconsist[e]ncies in her testimony."  *Id.*  Respondent argues that this claim is unexhausted but should be denied on the merits.

This claim is unexhausted because it was not fairly presented to the California Supreme Court in either of the only two petitions Ms. Vlahos-Schmidt filed in the California Supreme

Court.  *See* Docket No. 14-7 at 84-95 and 100-120.  Again, the district court may deny, but not grant, relief on a habeas petition that presents an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1).  The district court can deny an unexhausted claim if "it is perfectly clear that the applicant does not raise even a colorable federal claim."  *Cassett*, 406 F.3d at 623-24.

Ms. Vlahos-Schmidt's claim that counsel was ineffective in convincing her to testify "does not raise even a colorable federal claim."  *Id.*  Without Ms. Vlahos-Schmidt's testimony, there would have been *no* viable defense of self-defense at trial.  The only persons present when she stabbed Mr. Lopata in the back on June 28th were her and Mr. Lopata.  Given Mr. Lopata's testimony that he did not hit her, and instead that she ran up and stabbed him from behind, there was no basis for a claim of self-defense without her testimony that she stabbed Mr. Lopata because he was punching her in the face. The testimony of Ms. Brown and Mr. Oropeza about threats and violence that occurred months earlier would not have been enough to make any credible self-defense claim if there was not some sort of aggression by Mr. Lopata on the very day he was stabbed.  Stabbing Mr. Lopata based only on something he did or said months earlier would have made Ms. Vlahos-Schmidt the aggressor or provocateur -- neither of which would have shown self defense.  *See* footnote 1 (quoting jury instructions on defendant's mutual combat, aggression and provocation).  In short, she fails to show how she would have had any chance of avoiding conviction without her own testimony.  Moreover, her assertion of "gaps" and "inconsistencies" in her testimony are not supported by the record; the attorneys did not mention the excluded incidents in their questioning of Ms. Vlahos-Schmidt, and the jurors would not have had a basis to see her as evasive about events that took place months before the stabbing.  Her testimony was absolutely essential to her claim of self-defense; therefore, any effort by counsel to convince Ms. Vlahos-Schmidt to testify, such advice did not amount to deficient performance nor did it result in prejudice.  She is not entitled to the writ on this claim.

C.    Prosecutorial Misconduct Claims

1.    Background

Ms. Vlahos-Schmidt contends that the prosecutor engaged in misconduct during his closing argument when he commented on the defense's failure to produce evidence, misstated

United States District Court
For the Northern District of California

1  testimony of defense witnesses and commented on sentencing.

2         Ms. Vlahos-Schmidt presented her claims in her petition for writ of habeas corpus to the

3  Alameda County Superior Court.  The Alameda County Superior Court rejected the claims as

4  untimely[7] and on the merits.  The superior court found that "the arguments made by the prosecutor

5  were permissible comments on the failure to introduce material evidence or call logical

6  witness[es].  (See *People v. Szeto* (1981) 29, Cal. 3d 20, 34."  Docket No. 1 at 56.

7         The superior court's rejection of Ms. Vlahos-Schmidt's prosecutorial misconduct claim is

8  the last reasoned decision from a state court, and therefore is the decision to which § 2254(d) is

9  applied.[8]  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92.  Ms. Vlahos-Schmidt is

10  entitled to habeas relief only if the superior court's decision was contrary to, or an unreasonable

11  application of, clearly established federal law from the U.S. Supreme Court, or was based on an

12  unreasonable determination of the facts in light of the evidence presented.

13         2.    Analysis

14         The appropriate standard of review for a prosecutorial misconduct claim in a federal

15  habeas corpus action is the narrow one of due process and not the broad exercise of supervisory

16  power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutors'

17  remarks were undesirable or even universally condemned'"); *Smith v. Phillips*, 455 U.S. 209, 219

18  (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

19  fairness of the trial, not the culpability of the prosecutor.")  Under *Darden*, the inquiry is whether

20  the prosecutor's remarks were improper and, if so, whether the comments infected the trial with

21  ─────────────────

22  [7] Respondent points to the superior court's rejection of the claim as untimely filed and argues that
    the claim is procedurally defaulted as well as meritless.  The Court need not reach the procedural
23  default question because the claim fails on the merits.  *Cf. Franklin v. Johnson*, 290 F.3d at 1232
    ("Procedural bar issues are not infrequently more complex than the merits issues presented by the
24  appeal, so it may well make sense in some instances to proceed to the merits if the result will be
    the same.")

25  [8] The superior court's decision is a reasoned decision because it explains at least some of its
26  analysis.  Even if the decision was considered to be an unexplained denial as to those portions of
    the prosecutorial misconduct claim not discussed -- i.e., that the prosecutor improperly misstated
27  testimony of defense witnesses and commented on sentencing --  the outcome would be the same
    here.  When a state court has not explained the basis for rejecting a claim on the merits, the federal
28  habeas court must determine the arguments and theories that did or could support the state court's
    rejection and apply § 2254(d) to the decision.  *See* footnote 6, *supra*.

United States District Court
For the Northern District of California

unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

a.    Comments On Defense Failure To Produce Evidence

Ms. Vlahos-Schmidt argues that the prosecutor improperly argued about "evidence that the petitioner did not produce, implying that the petitioner was obligated to produce that evidence to prove her innocence." Docket No. 1 at 7. She points to the following statements by the prosecutor during his rebuttal closing argument:

> • "[T]here is no evidence that she tried to break her lease; there is no evidence that she tried to leave; there is no evidence that she didn't want to live there anymore; there is no evidence of her ever making a police report." RT 321.

> • "We have a failure by the defense to call logical witnesses. If there is an officer who could testify that Ms. Vlahos-Schmidt ever made a 911 call, that she ever filed a police report, that there was ever an incident where Zenon Lopata acted in anger, in violence towards Ms. Vlahos-Schmidt, we would have heard from that witness, and you didn't because there isn't one." RT 323.

> • "You would have heard from the property manager if there had been complaints made by Ms. Vlahos-Schmidt; you would have seen corroboration if any of that was true; you would have heard from an officer. If the defendant had made a statement that she claimed, you would have seen that as evidence. Any 911 call, any police report." RT 324.

> • "If there was a witness to corroborate the things that defense counsel is saying, that witness would have been called and you would have heard him, but we didn't. Because many of the things that the defense said are not true." RT 325-26.

> • "It is fair because the defense failed to call some of these logical witnesses if you want to believe part of their story. It is fair to say that because those witnesses were called, those things were not corroborated. Those statements were not true. That is part of the things that you should consider." RT 327. (Defense counsel's objection that this misstated the law was sustained. *Id.*

The superior court's determination that these "were permissible comments on the failure to introduce material evidence or call logical witness[es]," Docket No. 1 at 56, was not contrary to, or an unreasonable application of, clearly established law, as set forth by the United States

1    Supreme Court.

2         This was not a case in which the prosecutor's comments intruded on a defendant's right

3    not to testify, because Ms. Vlahos-Schmidt had testified.  *See Griffin v. California,* 380 U.S. 609,

4    615 (1965) (self-incrimination clause of the Fifth Amendment "forbids either comment by the

5    prosecution on the accused's silence or instructions by the court that such silence is evidence of

6    guilt.")  In contrast to impermissible comments about a defendant's failure to testify, the

7    prosecutor had room to argue about the gaps in the defense case.

8              There is a distinction between a comment on the defense's failure to
           present exculpatory evidence as opposed to a comment on the
9           defendant's failure to testify. This Court has recognized that "'a
           prosecutor may properly comment upon the defendant's failure to
10          present exculpatory evidence, as long as it is not phrased to call
           attention to defendant's own failure to testify.'" . . .  It is equally
11          clear that "'[a] comment on the failure of the *defense* as opposed to
           the *defendant* to counter or explain the testimony presented or
12          evidence introduced is not an infringement of the defendant's Fifth
           Amendment privilege.'"

13

14   *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) (citations omitted).  "Criticism of

15   defense theories and tactics is a proper subject of closing argument."  *United States v. Sayetsitty*,

16   107 F.3d 1405, 1409 (9th Cir. 1997).

17        Here, the challenged comments were made during the prosecutor's rebuttal.  When the

18   alleged improper comments are made during rebuttal, the court should examine the statements in

19   the context of the arguments they rebut.  *See United States v. Young,* 470 U.S. 1, 17-18 (1985);

20   *e.g., id.* at 17-18 (although expression of prosecutor's personal opinion as to defendant's guilt  was

21   improper, "any potential harm from this remark was mitigated by the jury's understanding that the

22   prosecutor was countering defense counsel's repeated attacks on the prosecution's integrity and

23   defense counsel's argument that the evidence established no such crime."); *Darden*, 477 U.S. at

24   182 (trial was not rendered fundamentally unfair when "[m]uch of the objectionable content was

25   invited by or was responsive to the opening summation of the defense.")

26        In Ms. Vlahos-Schmidt's case, the prosecutor in his closing argument went through the

27   charges against Ms. Vlahos-Schmidt and argued that Mr. Lopata was more credible in his account

28   of the stabbing than she was.  *See* RT 283-99.  The prosecutor pointed out that Mr. Lopata had

made previous calls to 9-1-1 to complain about Ms. Vlahos-Schmidt's behavior, and that Ms. Vlahos-Schmidt had not herself previously called the police to complain about Mr. Lopata.

The defense then made a closing argument that highlighted the injuries that Ms. Vlahos-Schmidt had suffered, identified inconsistencies in Mr. Lopata's testimony, and urged that Ms. Vlahos-Schmidt feared for her life when she stabbed Mr. Lopata.  RT 299-300, 303-09.  Defense counsel three times pointed out that the prosecutor had the burden of proof to prove beyond a reasonable doubt that the defendant had not acted in lawful self-defense.  RT 300.  After arguing why the jury should not believe Mr. Lopata's account of prior events, especially the February 20th stabbing, defense counsel laid out the defense theory of the case, i.e., that Mr. Lopata was abusive and frightened his housemates.  RT 311-12.  Defense counsel rhetorically asked, "What evidence is there to confirm that she's right?" and "What's the evidence that goes to show that this isn't something else?" other than self-defense.  RT 315, 316.  Defense counsel further argued that Ms. Vlahos-Schmidt did not want to be in the situation she was living in; had reported the problem to the property managers, but the property managers would not let her out of her contract; had reported the problem to her friends; and "had made efforts to try to get out of here, but was stuck in this environment."  RT 319.  Defense counsel tried to convince the jury that Mr. Lopata was a threatening and violent housemate who scared both Ms. Vlahos-Schmidt and Ms. Brown.

The prosecutor's rebuttal argument noted the failure of the defense to call logical witnesses, and made the challenged statements, quoted on page 27, *supra*.  The prosecutor pointed out the absence of evidence to corroborate the defense evidence that supposedly showed Mr. Lopata's violent and threatening tendencies.  For example, whereas defense counsel pointed out that Ms. Vlahos-Schmidt had tried to break her lease and complained to the property manager, the prosecutor pointed out that the defense had not presented testimony or documentation from the property manager to confirm the defendant's own testimony.  Likewise, whereas defense counsel highlighted Ms. Vlahos-Schmidt's testimony about Mr. Lopata's previous threats and violence, the prosecution pointed out that there was no evidence that Ms. Vlahos-Schmidt had ever called 9-

**United States District Court**
For the Northern District of California

1-1 or made a police report (in contrast to Mr. Lopata, who had called 9-1-1 on three occasions).[9] The prosecutor's argument had the effect of challenging the truthfulness of the defendant's statements as well as showing that the alleged violence/harm wrought by Mr. Lopata on previous occasions was not as severe as defense counsel had argued.

"A prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). The comments did not improperly call attention to a defendant's choice not to testify (because Ms. Vlahos-Schmidt had testified), and the comments did not shift the burden of proof to the defense. The prosecutor's argument, which did not misstate the law or the facts (and was responsive to defense counsel's argument that urged the jury to believe her client's version over Mr. Lopata's version of the housemate wars), did not render the trial fundamentally unfair. *See Tan*, 413 F.3d at 1113 ("because we discern no assertion or presentation of false facts, or any deception by the prosecutor, we conclude that this aspect of the petitioners' case has no merit").

The trial court's jury instructions also support a determination that the prosecutor's arguments did not render the trial fundamentally unfair. "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates," whereas the latter "are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. 370, 384-85 (1990) (citation omitted). Here, the trial court instructed the jury on self-defense, and .that instruction clearly put the burden on the prosecution to "prov[e] beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty." CT 116. The jury also

---

[9] Ms. Vlahos-Schmidt contends that the prosecutor engaged in misconduct by arguing that "there is no evidence of her ever making a police report," RT 321, and that there is no evidence from the police that she "ever made a 911 call, that she ever filed a police report," RT 323, 324. But the prosecutor's statements were technically correct: There was no evidence that Ms. Vlahos-Schmidt ever made a police report or called 9-1-1. She was present when Ms. Brown called 9-1-1, but she did not herself call 9-1-1. And neither Ms. Brown nor Ms. Vlahos-Schmidt made a police report, because they left before the police arrived.

United States District Court
For the Northern District of California

was instructed on reasonable doubt; the elements of the charged crime, as to which the prosecution bore the burden of proof; and the sentence enhancement allegations, as to which the prosecution bore the burden of proof beyond a reasonable doubt.  CT 93, 112-15.  The trial court instructed that the jurors "must follow the law as I explain it to you," and that, if the "attorneys' comments on the law conflict with my instructions, you must follow my instructions."  CT 89.  The trial court further instructed that "[n]othing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."  CT 94.  Ms. Vlahos-Schmidt has provided no reason to depart from the normal presumption that jurors follow the court's instructions.  *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

b.  Alleged Misstatements of Defense Witnesses' Testimony

Ms. Vlahos-Schmidt argues that the prosecutor misstated the testimony of Josh Oropeza, who was present on February 20th.  The prosecutor argued that "even the band member said, if I had known that she had stabbed help [sic] in the arm, that would have made things totally different.  Then I would have understood.  It would have been – he would have seen it in a totally different light had he known that she stabbed him with the pocket knife at the beginning of that incident, and that certainly he would have been justified in pushing her out of his room at that point to protect himself."  RT 288.  The prosecutor also argued in rebuttal, "Even Josh in the band, this morning, he said how always he thinks it is wrong to push a woman.  'I think it is wrong to put a hand on a woman.'  I understand that.  But when I said, Are you aware that Mrs. Vlahos-Schmidt had stabbed him with a pocket knife, that there was an actual injury to Mr. Lopata's arm, he said that would have completely changed the way I looked at that incident.  I would have looked at it completely differently under those circumstances."  RT 325.

The prosecutor did overstate Mr. Oropeza's testimony because Mr. Oropeza said that his view that it was wrong for Mr. Lopata to push Ms. Vlahos-Schmidt "would depend" on which happened first, the stabbing or the pushing.  Mr. Oropeza did not testify that his view that it was wrong to push a woman would be "completely" or "totally" different or that the man "certainly"

**United States District Court**
For the Northern District of California

would have been justified in pushing the woman.[10]  The prosecutor's argument was hyperbole on

an unimportant point that did not make the trial fundamentally unfair.  Frankly, Mr. Oropeza's

views on the propriety of men pushing women did not matter to any decision the jury had to make.

What was important was whether something had occurred before Mr. Lopata pushed Ms. Vlahos-

Schmidt.  The prosecutor tried to show through his questions and in his argument that Mr.

Oropeza had only seen the tail end of the altercation, and would not have had a similar reaction if

he knew Ms. Vlahos-Schmidt had stabbed Mr. Lopata before she was pushed by Mr. Lopata.  The

prosecutor's argument that imparted a degree of certainty to Mr. Oropeza's somewhat equivocal

views did not so infect the trial with unfairness as to result in a due process violation.  *See United*

*States v. Sullivan*, 522 F.3d 967, 982 (9th Cir. 2008) (argument that defendant "lied or misled the

bankruptcy court" was a permissible inference drawn from the record, even if the prosecutor stated

the fact more forcefully than the witness had in testifying that defendant provided incomplete

information).

      Ms. Vlahos-Schmidt next argues that the prosecutor engaged in misconduct when he

argued:  "What did we hear from her partner?  We heard that he knows that she had a drinking

---

[10] Mr. Oropeza had testified on direct examination that he had turned his head and saw Mr. Lopata pushing Ms. Vlahos-Schmidt, and believed it was wrong to push a woman.  RT 195-96 ("It upset me. . . . [b]ecause I have never really seen a man lay his hands on a woman like that;" "I told him not to do that, that I found it very disrespectful").  On cross-examination, the prosecutor then tried to demonstrate that Mr. Oropeza had only seen the tail end of the incident and was unaware of some pertinent details:

> Q:  And it's wrong to push a woman, right?
> A:  I believe so.
> Q:  Are you aware that Ms. Vlahos-Schmidt had a pocket knife with her at that time?
> A:  No.
> Q:  Are you aware that she stabbed him in the arm with a pocket knife?
> A:  No.
> Q:  Would that change the way that you look at him pushing her out of his room?
> A:  I guess it would depend – like depending on what happened first.

RT 202. On re-direct examination, defense counsel asked, "Did anybody touch Mr. Lopata other than the contact you saw between Ginger and Mr. Lopata?" and Mr. Oropeza answered, "No."  RT 204.

**United States District Court**
For the Northern District of California

1  problem.  She got help from a six-month program."  RT 322.  This claim fails because the

2  prosecutor's argument was a fair interpretation of the testimony of her former partner, Mr.

3  Lindsay.  Mr. Lindsay testified that he had seen Ms. Vlahos-Schmidt drink too much and make

4  bad decisions when drunk; and that Ms. Vlahos-Schmidt had a DUI incident.[11]  This testimony

5  provided a reasonable foundation for the prosecutor to argue that the witness had testified that Ms.

6  Vlahos-Schmidt had a "drinking problem," even if the witness did not use that precise phrase.  Mr.

7  Lindsay also testified that Ms. Vlahos-Schmidt attended a court-ordered alcohol abuse program.

8  Perhaps she was not helped by the program, but it was not an improper comment on that evidence

9  for the prosecutor to argue that Ms. Vlahos-Schmidt got help from attending a 6-month alcohol

10  abuse program.  A prosecutor "is granted reasonable latitude to fashion closing arguments," and is

11  "free to argue reasonable inferences from the evidence."  *United States v. Gray*, 876 F.2d 1411,

12  1417 (9th Cir. 1989).  The prosecutor's comment on Mr. Lindsay's testimony was not improper

13  because it was a permissible argument about the inferences to be drawn from the evidence.

14          c.        <u>Sentencing Comments</u>

15          To finish his closing argument, the prosecutor argued: "No matter what the judge is going

16  to do, no matter whether this is probation or community service, or whatever she gets, that's up to

17  the judge; you cannot consider that.  But what you must decide is that this was an assault, that she

18

19  _____

19  [11] After the defense had asked Mr. Lindsay several questions to establish Ms. Vlahos-Schmidt's

20  nonviolent and nonargumentative character, the prosecutor asked several questions about her
   alcohol consumption on cross-examination:

21          Q:     You've seen her drink?

21          A:     Yeah.

22          Q:     You've seen her drink too much?

22          A:     Yeah.

23          Q:     In the cases where she's drunk too much, have you seen her
   make bad decisions?

24          A:     That's true, yeah.

24          Q:     In the time that you've known her, has she ever been in an

25  alcohol program?

25  [objection overruled]

26          A:     She went to – she had a DUI and had a court order alcohol
   program.

27          Q:     How long was that program?  Do you know?

28          A:     I don't remember.  About six months or something like that.

28  RT 175.

used a knife; and that when she stabbed him, when [s]he plugged him with that knife, she caused great bodily injury.  There is no justification. There is no excuse." RT 299.  Ms. Vlahos-Schmidt contends that the first sentence of the quoted remarks "made unlawful comments on sentencing, suggesting to the jury that the petitioner would receive probation or community service if convicted."  Docket No. 1 at 6.

Out of the jury's presence, defense counsel later objected that the prosecutor's argument "certainly impl[ied] that if [she] got convicted, there is a sentence that's different than what the law requires, and it is putting out something about punishment that's prohibited."  RT 350-51. The trial judge disagreed and stated, "I think the way [the prosecutor] used it was that you're not to consider it; and then I did tell them again in – both times that they were not to consider punishment."  RT 351.  Ms. Vlahos-Schmidt made the same argument again in her habeas petition filed in the superior court, where it was rejected without discussion.

The state court's rejection of this claim of constitutional error was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court.  The prosecutor did not tell the jury or hint that Ms. Vlahos-Schmidt would receive only probation or community service if convicted.  The prosecutor also mentioned that she could get another punishment, as he argued that it was up to the judge to decide punishment, "no matter whether this is probation or community service, *or whatever she gets.*"  RT 299 (emphasis added). Additionally, the trial judge instructed the jury not to consider punishment:  "You must reach your verdict without any consideration of punishment." CT 119.  The prosecutor's argument that was consistent with the jury instruction that the jury was not to consider punishment did not make the trial fundamentally unfair.  *See San Nicolas v. Dexter*, 470 F. App'x. 638 (9th Cir. 2012) (habeas relief properly denied where prosecutor characterized the law to his favor but did not misrepresent the law and actually read aloud the correct standard jury instructions on self-defense).

"Particularly because the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,'" *Parker*, 132 S. Ct. at 2155 (citation omitted), the Alameda County Superior Court's rejection of Ms. Vlahos-Schmidt's prosecutorial misconduct claims did not meet the demanding standard of 28 U.S.C. § 2254(d)(1).

United States District Court
For the Northern District of California

1    She is not entitled to relief on her prosecutorial misconduct claim.

2    D.    Cumulative Error Claim

3        Ms. Vlahos-Schmidt contends that the cumulative effect of several errors warrants

4    reversal.  In some cases, although no single trial error is sufficiently prejudicial to warrant

5    reversal, the cumulative effect of several errors may still prejudice a defendant so much that his

6    conviction must be overturned. *See Alcala v. Woodford,* 334 F.3d 862, 893–95 (9th Cir. 2003)

7    (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge

8    every important element of proof offered by prosecution).  "[T]he fundamental question in

9    determining whether the combined effect of trial errors violated a defendant's due process rights is

10   whether the errors rendered the criminal defense 'far less persuasive,' *Chambers* [*v. Mississippi*,

11   410 U.S. 284, 294 (1973)], and thereby had a 'substantial and injurious effect or influence' on the

12   jury's verdict, *Brecht*, 507 U.S. at 637." *Parle v. Runnels,* 505 F.3d 922, 927 (9th Cir. 2007).

13   Here, there were not multiple trial errors to accumulate.  Ms. Vlahos-Schmidt therefore is not

14   entitled to relief under the cumulative error doctrine.

15   E.    Ineffective Assistance of Appellate Counsel Claim

16       Ms. Vlahos-Schmidt contends that appellate counsel provided ineffective assistance in that

17   counsel failed to raise on appeal "all of the issues raised in this petition, and for two years he led

18   her to believe that he would, but then suddenly said 'I'm not paid to do that.'"  Docket No. 1 at 7.

19       The Alameda County Superior Court rejected this claim when it was raised in Ms. Vlahos-

20   Schmidt's habeas petition to that court.  Docket No. 1 at 58-59.  The superior court discussed only

21   the claim that appellate counsel was ineffective in failing to argue that trial counsel was

22   ineffective, and rejected the claim for lack of prejudice:  "Failure of appellate counsel to include

23   an ineffective assistance of counsel claim on appeal was not prejudicial, as it would not have

24   arguably resulted in reversal."  Docket No. 1 at 58.

25       As the last reasoned decision from a state court, the Alameda County Superior Court's

26   decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423

27   F.3d at 1091-92; *see* footnote 6, *supra*.  Ms. Vlahos-Schmidt is entitled to habeas relief only if the

28   Alameda County Superior Court's decision was contrary to, or an unreasonable application of,

1    clearly established federal law as set forth by the U.S. Supreme Court.

2         The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

3    effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387,

4    391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to

5    the standard set out in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  A defendant must

6    show that appellate counsel's advice fell below an objective standard of reasonableness and that

7    there is a reasonable probability that, but for counsel's unprofessional errors, he would have

8    prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989) (citations

9    omitted).  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

10   requested by a defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of

11   weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *See*

12   *Miller*, 882 F.2d at 1434; *see also Jones*, 463 U.S. at 751-52.

13        Ms. Vlahos-Schmidt is not entitled to habeas relief on her claim that appellate counsel

14   provided ineffective assistance of counsel.  Ms. Vlahos-Schmidt states in her traverse that she

15   demanded that counsel raise every argument on appeal that she presents in her federal habeas

16   petition.  But the Supreme Court has never held that that appellate counsel is a scrivener who must

17   raise every claim on appeal that a client demands.  Indeed, the *Jones* case points in the opposite

18   direction, as it recognizes that weeding out weaker issues is effective appellate advocacy.

19   Moreover, Ms. Vlahos-Schmidt did present in a state habeas petition all but two of the claims that

20   she contends appointed appellate counsel should have briefed.  All those claims were rejected both

21   as untimely *and* on the merits.  And this Court found that the two ineffective assistance of trial

22   counsel claims that were not included in Ms. Vlahos-Schmidt's state habeas petition were plainly

23   meritless.  The superior court reasonably determined that Ms. Vlahos-Schmidt failed to establish

24   prejudice from appellate counsel's alleged failure to brief all the arguments that she presents in her

25   federal habeas petition.  She is not entitled to the writ on this claim.

26   F.    No Certificate Of Appealability

27        A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

28   which "reasonable jurists would find the district court's assessment of the constitutional claims

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


**IT IS SO ORDERED**.


Dated: July 22, 2016

_____
EDWARD M. CHEN
United States District Judge